LOMURRO, DAVISON, EASTMAN & MUNOZ, P.A.
Monmouth Executive Center
100 Willow Brook Road, Suite 100
Freehold, NJ 07728
(732) 462-7170
Attorneys for Defendants, Tyler Bennett & Daniel Spector

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FAMECO REAL ESTATE, L.P., <br><br> Plaintiff, <br><br> v. <br><br> TYLER BENNETT, DANIEL SPECTOR, WINICK REALTY GROUP, LLC and WINICK REALTY GROUP LLC NJ, <br><br> Defendants. | Case No. 12-CV-06102-JAP-TJB <br><br> Civil Action <br><br> **DECLARATION OF DANIEL SPECTOR** |

I, DANIEL SPECTOR, of full age, do hereby declare under penalty of perjury, as follows:

1. I am a Defendant in this matter. I am licensed as a salesperson to sell and lease real estate in the State of New Jersey. I am a former salesperson for Plaintiff, Fameco Real Estate, L.P. ("FRELP").

2. I make this Declaration in opposition to the motion for expedited discovery filed by FRELP. As I understand the application to the Court, FRELP wants to obtain information solely within my knowledge. Contrary to FRELP's allegations, FRELP has the ability to obtain all of the information that it

1

is requesting me and Tyler Bennett to gather on finalized and pending real estate transactions and provide it through expedited discovery. FRELP is equally able to contact the landlords, tenants and other brokers involved in these finalized and pending transactions, but would instead prefer to have Tyler Bennett and I contact these individuals instead. FRELP has access to the same information and same contacts. In addition, FRELP has cut off my ability to access my files and my computer since the date of my resignation.

3. Furthermore, FRELP has notified Tyler Bennett and I that it is keeping our share of the commissions we already earned for finalized transactions and will earn when pending transactions are finalized. FRELP has stated we will not be paid for what is rightfully ours. Therefore, since only FRELP will benefit from our work, it is only fair that FRELP should also exert the effort necessary to contact the individuals involved in these transactions.

4. In addition, FRELP's "proof" for its allegation that Tyler Bennett and I have consistently been violating our restrictive covenants falls woefully short of supporting these lofty allegations. For example, the e-mails attached as Exhibit D to the Declaration of Michael Levin are harmless – the e-mails were sent to my personal e-mail address because they actually pertained to a possible transaction for S&D Development, LLC, a

2

primarily family-owned real estate company dealing in net leases that I am allowed to be involved with pursuant to my broker-salesperson agreement with FRELP.  (Attached hereto as *Exhibit A* is a true copy of my FRELP broker-salesperson agreement, p. 3, § 13).

5.   Accordingly, there was absolutely nothing wrong with me negotiating possible transactions for a family-owned real estate company through my personal e-mail address and the inclusion of this exhibit is meant to mislead the Court.

6.   Likewise, the content of the remaining e-mails attached to Michael Levin's Declaration are innocuous, at best, and fall far short of somehow establishing that Tyler Bennett and I were stealing clients or any type of proprietary information from FRELP.

7.   It does appear, however, that FRELP has improperly invaded my privacy by accessing my personal e-mail account and reviewing my private e-mails in an attempt to obtain "proof" in support of this motion for expedited discovery.  The e-mails are "redacted" to hide the manner in which the information was obtained.

8.    From 2008 through July of 2012, I was employed by FRELP as a real estate salesperson representing retailers and landlords in commercial real estate transactions.

9. On June 27, 2012, I advised FRELP that I was resigning from my position because of FRELP's poor corporate culture, because of a lack of sufficient oversight of FRELP's New Jersey office, and because of FRELP's practice of condoning poor employee behavior as well as conflicts of interest amongst its client base, all of which were hindering my ability to represent my clients. (Attached hereto as *Exhibit B* is a true copy of my resignation letter). Along with my resignation letter, I submitted a list of commissionable transactions setting forth the deals I worked on while I was employed by FRELP; both pending and finalized, and assumed that FRELP and I would split the commissions 50/50 pursuant to the terms of my broker-salesperson agreement. (*Id.* at pp. 1-2 and *Exhibit A* at § 2, p. 9).

10. My broker-salesperson agreement with FRELP only requires that I include on my proposed list of commissionable transactions all transactions to which I believe I am entitled to an "Earned" commission. (*Id.* at § 2, p. 9, §§ 5-6, pp. 10-11 and §§8-9, pp. 11-12). The agreement defines a commission as "Earned" if, on June 27, 2012, two documents had been executed: a sale or lease <u>and</u> a commission agreement. (<u>Id.</u> at §9, p. 13).

11. Although the broker-salesperson agreement only obligated me to list transactions that resulted in a signed contract, at FRELP's request, my list of commissionable

4

transactions included deals that were pending but looked as though they would be finalized. FRELP wanted me to continue to work on these pending transactions, contact the landlords, tenants and/or brokers who were involved, and upon the transactions' completion we would split the commissions equally.

12. After my June 27 resignation and submission of my proposed list of commissionable transactions, the FRELP executives and I began to negotiate the specifics of my termination, my entitlement to prior and future Earned commissions, exceptions to the restrictive covenant in my broker-salesperson agreement and my giving FRELP a limited portion of the commissions that I would earn in the future due to my continued representation of certain clients. Some of those clients were Walmart, Chiptole Mexican Grill and Jersey Mike's Subs.

13. Since FRELP negotiated in a piecemeal fashion and multiple individuals were involved, the negotiations became awkward, giving me the impression that FRELP's executive team and its Partners could never agree amongst themselves on a resolution of the issues. I also found that during our negotiations, FRELP, upon modifying proposed settlement agreements, would frequently incorporate one-sided and unfavorable language that we had not previously agreed upon, apparently with the intention that I would simply condone this

5

action unwittingly or accept the change without any additional negotiations.

14. After we conducted more negotiations, on August 6, 2012, I was surprised to receive from Michael Levin a proposed settlement agreement that he implied I had agreed to execute. (Attached hereto as *Exhibit C* is a true copy of Michael Levin's August 6, 2012 e-mail to me and the proposed settlement agreement attached thereto). Since a review of the settlement proposal made it clear that FRELP was unable to fairly negotiate this matter directly with me, I did not execute the unreasonable proposal nor did I respond to Michael Levin after receiving his e-mail.

15. Although FRELP was continuing to ask me to provide it with information concerning finalized and pending transaction identified on my list of commissionable transaction, on September 4, 2012, FRELP sent me a cease and desist letter advising that it believed I was violating my restrictive covenant. (Attached hereto as *Exhibit D* is a true copy of the September 4, 2012 letter).

16. Since I was still attempting to amicably resolve this matter with FRELP, throughout September of 2012, I had my attorneys contact FRELP's counsel and make settlement proposals in an attempt to resolve this matter. (Attached hereto as

6

*Exhibit E* are true copies of correspondence sent by my attorneys to FRELP to attempt to resolve this matter).

17. To my knowledge, FRELP never formally responded to these settlement overtures. I never received any type of a written counterproposal.

18. Instead of responding to our detailed business proposals to settle the matter FRELP initiated this case when it filed a Complaint on September 27, 2012. Quizzically, although FRELP expressed an unwillingness to openly negotiate, it continued to informally request information from me concerning the status of transactions that were finalized or pending even though they filed a lawsuit against us.

19. Since I am entitled to a percent of the commissions on these transactions, I was previously willing to contact the individuals involved and provide FRELP with whatever information I could obtain. Notably, there was nothing preventing FRELP from contacting the individuals involved in these transactions; it just preferred that I go through the effort of communicating with them instead.

20. However, when it became apparent that FRELP was not paying me commissions I had already earned,[1] I became reluctant to help FRLEP with these transactions. On October 23, 2012, FRELP sent me a letter formally notifying me that FREP was not

---

[1] As of this date, FRELP owes me significant monies in payments for which they have received the commissions but refuse to remit to me.

7

going to pay me any of my commissions because it believed I was violating my one-year restrictive covenant in my broker-salesperson agreement.  (Attached hereto as *Exhibit F* is a true copy of Michael Levin's October 23, 2012 letter to me).

21. Upon my receipt of FRELP's formal notification that it was not going to pay me any of the commissions I had earned on my finalized deals or that I was going to earn on the deals that were pending, it no longer made any sense for me go through the effort of contacting the landlords, tenants and other brokers associated with these transactions.

22. My ability to contact these individuals is not unique to me.  FRELP's representatives are more than able contact the representatives of the landlords, tenants and other brokers who are involved in these transactions and request that they directly provide FRELP with the information it is seeking. FRELP would simply prefer that Tyler Bennett and I exert this effort instead for no compensation.

23. While employed by FRELP, when I would work at home I frequently would forward e-mails to my personal e-mail account due to the limitations and lag time associated with remote access to FRELP's computer network.  It was just easier to work this way.  Therefore, it was not uncommon for me to forward e-mails to my personal e-mail account.

24. Thus, it is insincere for FRELP to allege that Exhibit C attached to Michael Levin's Declaration somehow establishes that I was stealing FRELP's proprietary information. The content of this e-mail is innocuous, at best. I have no use for a guest list to an event held at Amada in the new Revel casino in Atlantic City. I simply forwarded this to my Gmail account so I could read it at home. I had few, if any, contacts that were even attending this event.

25. Moreover, Exhibit C attached to Michael Levin's Declaration does not even show that an attachment was included in the e-mail I sent to my Gmail account. Even assuming an attachment was included, there was nothing proprietary or confidential about this information.

26. It is also disingenuous to allege, as Michael Levin does, that Exhibit B attached to his Declaration shows I was wrongfully diverting clients to a competitor before I terminated my affiliation with FRELP. Contrary to these lofty allegations, the e-mail simply reflects that Chipotle, a New Jersey client I represented, needed help with its operations in Long Island, New York. Since FRELP did not represent Chipotle in New York, and in fact does little if any work in Long Island, I was helping Lori, Chipotle's New Jersey representative who also does work for Chipotle in Long Island, with Chipotle's Long Island operations. Winick Real Estate already represented Chipotle in

9

the Manhattan area, so this did not pose any type of a problem. I was merely helping a client touch base with a representative in an area in which FRELP did not do any work.

27.  In addition, work in New York is not even covered by my restrictive covenant with FRELP. (*Exhibit A* at § 24, pp. 5-6). Accordingly, this piece of "proof" falls woefully short of proving that I was violating my restrictive covenant or stealing clients.

28. It is also ludicrous to allege that the documents attached as Exhibit D to Michael Levin's Declaration somehow establish that I was attempting to divert FRELP clients for my own personal gain while I was still with the company. These communications actually pertained to a possible transaction for S&D Development, LLC, a primarily family-owned real estate company dealing in net leases that I am allowed to be involved with pursuant to my broker-salesperson agreement with FRELP. There was nothing suspicious or underhanded about me sending these e-mails to my Gmail account or asking that communications to me be directed to my personal e-mail account, as opposed to my FRELP e-mail account.

29. In fact, the only suspicious aspect of Michael Levin's Declaration is that it shows FRELP has improperly accessed mine and Tyler Bennett's personal Gmail accounts long after we terminated our affiliation with the company. It is unnerving to

see FRELP go to these lengths of invading our own personal privacy in an attempt to somehow establish proof for its allegation that we are withholding information from it and violating our restrictive covenants.

30. FRELP's allegation that it only recently learned Tyler Bennett and I became affiliated with Winick Realty is also hollow. On September 20, 2012, FRELP sent a letter to Winick Realty claiming concerns over Winick Realty's affiliation with Tyler and me. (Attached hereto as *Exhibit G* is a true copy of the September 20, 2012 letter).

31. Accordingly, FRELP's "proofs" are nothing more than generalized allegations that are similar to those allegations set forth in FRELP's Complaint against Tyler Bennett and I. They are harmless, and fall far short of demonstrating that we were attempting to divert business from FRELP, were taking its proprietary information or were engaging in any other type of clandestine or improper behavior.

32. Furthermore, since the information FRELP seeks regarding these transactions is equally available to it, and since FRELP has already told Tyler Bennett and I that it is keeping the commissions we are entitled to under these transactions for itself, we respectfully request that FRELP's motion for expedited discovery be denied.

11

I DECLARE under penalty of perjury under the laws of the United States of America that the foregoing information contained herein is true and correct.

_____
DANIEL SPECTOR

Dated: November 19, 2012