```
LOMURRO, DAVISON, EASTMAN & MUNOZ, P.A.
Monmouth Executive Center
100 Willow Brook Road, Suite 100
Freehold, NJ 07728
(732) 462-7170
Attorneys for Defendants, Tyler Bennett & Daniel Spector
```

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FAMECO REAL ESTATE, L.P.,<br><br>           Plaintiff,<br><br>     v.<br><br>TYLER BENNETT, DANIEL SPECTOR,<br>WINICK REALTY GROUP, LLC and<br>WINICK REALTY GROUP LLC NJ,<br><br>           Defendants. | Case No. 12-CV-06102-JAP-TJB<br><br>Civil Action<br><br>**DECLARATION OF TYLER BENNETT** |

I, TYLER BENNETT, of full age, do hereby declare under penalty of perjury, as follows:

1. I am a Defendant in this matter. I am licensed as a salesperson to and lease sell real estate in the State of New Jersey and I am in the process applying for my real estate broker's license.  I am a former salesperson for Plaintiff, Fameco Real Estate, L.P. ("FRELP").  I started with FRELP in 2010 and resigned on July 17, 2012.

2. I make this Declaration in further support of the motion to dismiss FRELP's First Amended Complaint due to lack of

1

subject matter jurisdiction and specifically to bring to the Court's attention FRELP's consistent and continual representations to myself, to FRELP's other employees and associates and to the public at large that Jay Miller is an unqualified FRELP Partner.

3. When I began my affiliation with FRELP in April of 2010, it was my understanding that Jay Miller was a FRELP Partner, with equal authority, status and responsibilities as FRELP's undisputed equity Partners identified in the Declaration of Michael Levin submitted in opposition to this motion. In March or April of 2010, when I interviewed with all FRELP Partners at the company's office then located in Plymouth Meeting, Pennsylvania, Jay Miller attended the meeting and he and the other Partners held him out as a FRELP Partner with equal authority and responsibilities. I was told by Michael Levin, that if I achieved the financial benchmarks that Miller did, making $500k gross per year for 3 consecutive years, then I too, could become a Partner at Fameco, just as Miller did. Miller was the newest partner at the time I joined, and he was used as a "model" of what I could become.

4. During my tenure at FRELP, never once was I advised that I should not seek out Jay Miller with respect to any of FRELP's operations or management issues because he was merely a non-equity Partner with limited authority and responsibilities.

2

To the best of my knowledge, FRELP's other employees and associates had the same understanding.

5. Likewise, at all times during my affiliation with FRELP, the company held Jay Miller out to me and its other employees and associates as a Partner with equal authority and responsibilities as the undisputed equity Partners. I relied upon these representations in interacting with the Partners tending to my daily responsibilities as a FRELP salesperson.

6. Although FRELP has cut-off my access to my FRELP files and e-mails, documents supporting FRELP's holding out Jay Miller as an unqualified Partner and Principal of the company are attached as *Exhibits A - C* to the Declaration of Mathew K. Blaine, Esq., submitted on November 9, 2012 in support of this motion. (See ECF Doc. No. 7-1 through 7-4).

7. Jay Miller also represented to me that he was a FRELP Partner. He never qualified this representation nor advised me that his obligations and responsibilities were limited in comparison to the undisputed equity Partners. I relied upon these representations in tending to my daily responsibilities and interacting with the FRELP Partners.

8. At times, Jay Miller relayed to me information concerning FRELP's management and operations. As a result of FRELP's and Jay Miller's representations concerning his status as a Partner, I never sought confirmation of this information

3

from any of FRELP's other Partners because I assumed the information was accurate, as it was coming from a Partner. I relied upon these representations as a FRELP salesperson in my interactions with Jay Miller.

9. A dispute arose when Jay Miller represented a landlord in a transaction and I was representing Buffalo Wild Wings, when another broker who was involved with the landlord claimed Jay Miller and I were trying to cut him out. I was appalled that Jay Miller, a Partner, failed to tell me about his arrangement with the other broker and allowed the situation to deteriorate so badly. In requesting guidance from Michael Levin about this situation, I specifically asked if Jay Miller was a Partner, and Michael Levin responded with a resounding "yes." This process delayed the deal and ultimately it did not materialize.

10. I had separate conversations with other FRELP New Jersey salespeople – Mike Horne, Steve Winters and Carlo Capparruva - who all confirmed to me their belief that Jay Miller was a FRELP Partner.

11. In addition, Jay Miller has told me that he attends the Partners' meetings and was aware of issues I had with conflicts of interest associated with FRELP's representation of competing clients, because the issues had been discussed at the Partners' meetings.

4

12. While I was a salesperson at FRELP, there were always issues concerning lack of sufficient supervision and management of FRELP's office in Iselin, New Jersey (the "New Jersey office"), which was where I worked.

13. Prior to Daniel Spector's resignation, Jay Miller appeared in FRELP's New Jersey office and advised all of FRELP's employees and associates stationed there that he was taking over one of the vacant offices and would serve as the FRELP Partner involved in the office to resolve these outstanding issues and get the office in order. Jay Miller advised me that he was going to be FRELP's Partner presence in the New Jersey office, and that the office was going to run differently than it had before.

14. Jay Miller took over the office of one of FRELP's undisputed equity Partners and the broker of record for the New Jersey office, Jeff Cohen, who had previously used the office a just a few times a month.

15. Never once did Jay Miller or any other FRELP Partner tell me or anyone else in the New Jersey office that Jay Miller's authority and responsibilities as a FRELP Partner were limited.

16. A few days after Daniel Spector resigned in June of 2012, Jay Miller reiterated to me that he would be stationed primarily out of the New Jersey office because the presence of

5

an active Partner was needed to tend to the needs of the office. It was clear that Jay Miller's concern regarding the New Jersey office's lack of supervision was expressed from the perspective of a FRELP Partner, as opposed to my perspective, which was that of one of FRELP's real estate salespeople. Jay Miller also told me that Daniel Spector had crossed the line with his resignation letter, when he accused FRELP of operating its New Jersey office improperly and in violation of the New Jersey Real Estate Commission's regulations.

17. I later had a conversation with Michael Levin in which I expressed my concerns over what Jay Miller told me. According to Michael Levin, Jay Miller was not supposed to share this information with me, as it was supposed to be kept internally amongst Partners.

18. After Jay Miller's announcement and his conversation with me in June of 2012, he began to frequent the New Jersey office at least two to three days a week. While he was in the office, he was the face of the Partnership, the same way that Jeff Cohen served as the face of the Partnership during his limited prior visits to the New Jersey office.

19. Never once was I advised that Jay Miller's authority and responsibilities as a FRELP Partner were more limited than those of Jeff Cohen.

I DECLARE under penalty of perjury under the laws of the United States of America that the foregoing information contained herein is true and correct.

_____
TYLER BENNETT

Dated:  November 26, 2012