GREENBAUM, ROWE, SMITH & DAVIS LLP
Eric Tunis, Esq.
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ  07095-0988
Tel:  (732) 549-5600
Fax:  (732) 549-1881
Attorneys for Plaintiff, Fameco Real
Estate, L.P.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FAMECO REAL ESTATE, L.P.,<br><br>    Plaintiff,<br><br>  v.<br><br>TYLER BENNETT, DANIEL SPECTOR, WINICK REALTY GROUP LLC, and WINICK REALTY GROUP LLC NJ<br><br>    Defendants. | Civil Action No. 3:12-cv-06102 (JAP)(TJB)<br><br>**REPLY DECLARATION OF MICHAEL LEVIN IN FURTHER SUPPORT OF MOTION FOR EXPEDITED DISCOVERY** |

**MICHAEL LEVIN**, hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1.  I am the Chief Operating Officer of Fameco Real Estate, L.P. ("Fameco").

2.  I make this Reply Declaration in further support of Fameco's Motion for expedited discovery, and I have personal knowledge of the facts set forth herein.

3.  I make this Reply Declaration in an effort to clarify several factual inaccuracies set forth in the Brief and

Declarations (the "Opposition Papers") submitted by defendants Tyler Bennett ("Bennett") and Daniel Spector ("Spector").

4.   First, defendants' claim that Fameco failed to act in response to their breaches of their restrictive covenants is simply untrue.

5.   Fameco did not immediately file an action against Bennett and Spector seeking a preliminary injunction because such an action might have an adverse impact on some of Fameco's current clients who Bennett and Spector continued to serve.

6.   Instead, Fameco spent months negotiating termination agreements with Bennett and Spector that would permit them to continue servicing certain Fameco clients in certain geographical areas after their departure in exchange for agreed upon compensation.   Under such an agreement clients would receive uninterrupted service, defendants would maintain client relationships otherwise barred by their restrictive covenants and Fameco would receive compensation for amending certain restrictions under those covenants.

7.   Following Spector's resignation, Jonathan Rome, Fameco's in-house counsel, and I began negotiating an amicable termination with Spector.   We were the only individuals to negotiate with Spector.

8.   Our negotiations culminated in August 2012, when following a telephone conversation we had with Spector, I

believed that we had come to a final agreement and presented him with a written version that faithfully reflected the terms to which we verbally agreed.

9.   Instead of providing comments or continuing the negotiations, Spector simply ignored the proposal, ceased communications with Fameco, and as we subsequently discovered, violated his restrictive covenant by continuing to service Fameco clients after he left the company.

10.   Fameco also spent the first few weeks following Bennett's resignation attempting to convince him to stay. However, it became apparent that Bennett did not want to remain at Fameco, so Fameco attempted to reach an amicable resolution that would allow Bennett to terminate his relationship with Fameco without harming any of its clients.

11.   These negotiations proved fruitless because Bennett falsely claimed he disclosed all pending deals to Fameco as he was required to do under his agreement with the Company.   In fact, Fameco discovered tracking reports Bennett kept on his computer that listed many undisclosed potential deals with Fameco clients.

12.   Initially, Mr. Rome and I conducted the negotiations. However, when we could not get Bennett to admit to the other deals that Fameco knew were in existence, Brandon Famous, Fameco's Chief Executive Officer, met with him on August 20,

2012.   However, Mr. Famous also could not convince Bennett to admit to the undisclosed pending deals that Fameco knew were in existence.

13.   In late August 2012, I attempted one last effort to negotiate with Bennett via telephone.   However, Bennett became combative in this conversation and it became apparent that negotiating with him would be impossible.

14.   It was at this time Bennett terminated his negotiations with Fameco.

15.   Prior to Fameco filing the original Complaint on September 27, 2012, Bennett and Spector were providing limited information to Fameco regarding pending deals.   It was not until after Fameco filed the Complaint that Bennett and Spector completely ceased providing Fameco with such information.

16.   The willingness of Bennett and Spector to work with Fameco prior to Fameco filing the Complaint demonstrates that both Bennett and Spector recognized that Fameco was relying upon them for certain information regarding pending deals.

17.   Once it became apparent to Fameco that Spector and Bennett had no intention of negotiating in a good faith manner, and instead preferred to breach their restrictive covenants, Fameco filed the Complaint in this action.

18.  Fameco was always cooperative with Bennett and Spector following their termination, in an effort to avoid harm to Fameco's clients, and has not taken any improper actions.

19.  Throughout their negotiations with Fameco, both Bennett and Spector were allowed access to company e-mails and any files that they needed to service Fameco customers.

20.  Furthermore, Fameco has never accessed Bennett or Spector's personal e-mail accounts.  In fact, any and all e-mails attached to my previously submitted Declaration were recovered from their Fameco accounts.

21.  Fameco never intended to jeopardize defendants' ability to earn a living.  The goal at all times was to amicably negotiate termination agreements with Bennett and Spector that would leave all parties satisfied, and not harm any Fameco clients.

22.  Fameco did not initially fill out Bennett's Experience report because it was reluctant to publicly question Bennett's moral character, given that he had been with the company for approximately two years and had a reasonably good relationship with the company owners and employees.

23.  Eventually, however, Bennett's continuing refusal to truthfully disclose all of the deals he was working on left Fameco with no choice but disclosure on the Experience Report that he was unwilling to do so.

5

24.   Under their respective agreements with Fameco, Bennett and Spector have forfeited any rights they may have otherwise had to any commissions because they have blatantly breached the agreements' restrictive covenants.   See Declaration of Tyler Bennett, Exhibit C, ¶ 24; Declaration of Daniel Spector, Exhibit A, ¶ 24.

25.   Moreover, while Bennett ironically claims Fameco owes him a "significant" amount in commissions, to date, Fameco has only received two commissions totaling $1,302.   At the same time, Bennett owes Fameco approximately $19,000, representing his draw balance, due at the time of his resignation.   See Declaration of Tyler Bennett, Exhibit C, ¶ 27.

26.   The information Fameco seeks in expedited discovery is not "freely available."

27.   I have spent countless hours unsuccessfully attempting to obtain information regarding finalized and pending real estate transactions in which Bennett and Spector were involved while affiliated with Fameco and, in most circumstances, I do not even know who defendants' contacts are, or even know where to begin. This information is exclusively or particularly in the possession of Bennett and Spector.

28.   Bennett and Spector are correct that their Broker-Salesperson Agreements only require that as a part of their

6

termination they disclose transactions for which the commission is "Earned," as that term is defined in the agreement.

29.  However, the Broker-Salesperson Agreement also states that as of the termination of their relationship with Fameco, Bennett and Spector forfeited any interest they had had in any other listed sale or lease that would have otherwise been payable at the time of sale or lease. See Declaration of Tyler Bennett, Exhibit C, pg 10; Declaration of Daniel Spector, Exhibit A, pg 10.

30.  In fact, when negotiations first began with Bennett and Spector, Fameco requested information regarding these transaction for which they had not "Earned" a commission, so that Fameco could determine the status of the transactions, and negotiate a percentages of the commission to which Bennett and Spector could receive.

31.  However, Bennett refused to provide such information, and instead continued to work for these Fameco clients without authorization and in an attempt to divert business away from Fameco.

32.  In addition to making several misstatements in the Opposition Papers, as cited above, Bennett and Spector completely fail to address the fact that they have been, and are currently are, breaching the restrictive covenants contained in their Broker-Salesperson Agreements.

33.    In  fact,  the  profiles  of  Bennett  and  Spector  on
Winick's  website,  explicitly  state  they  represent  Fameco
clients.   See Declaration of Michael Levin previously submitted
in support of motion for expedited discovery, Exhibit E.

34.    Moreover,  Fameco  has  recently  obtained  a  blast  e-mail
dated  November  13,  2012  from  Bennett  to,  among  others,  one  of
Fameco's  employees  Jay  Miller,  that  establishes  that  Bennett  is
still  actively  representing  Pep  Boys,  a  "Covered  Client,"  within
the  geographic  region  prohibited  by  the  Broker-Salesperson
Agreement.   A  true  and  accurate  copy  of  this  e-mail  is  attached
hereto  as  **Exhibit A.**

35.    To  my  knowledge  Spector  never  approached  Fameco
regarding  any  potential  deals  in  which  his  family  owned  business
S&D Development, LLC was involved.

36.    To  my  knowledge  Spector  never  provided  referrals  to
Winick  Realty  Group  LLC  prior  to  the  June  13,  2012  e-mail
attached  to  my  original  declaration  as  Exhibit  B.   Additionally,
as  a  general  matter,  Fameco  does  not  refer  business  to  Winick.

37.    There  was  an  attachment  to  the  e-mail  contained  in
Exhibit C of my original declaration.   It consisted of a list of
approximately  500  of  Fameco's  closest  client  contacts  in  the
area.   Given  the  sensitive  proprietary  nature  contained  therein,
it  was  intentionally  omitted  from  the  submission  to  the  Court.

38. Fameco cannot properly assess the extent of defendants' actionable conduct, mitigate the harm it already has suffered, and prevent future injury without additional information that is primarily or particularly in the possession of defendants.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on November 26, 2012

MICHAEL LEVIN

# EXHIBIT A

# REDACTED

From: Tyler Bennett [mailto:tbennett@winickmail.com]
Sent: Tuesday, November 13, 2012 12:56 PM
To: Jay Miller
Subject: Pep Boys Actively Seeking Sites

Having trouble viewing this email? http://winick.us/2012/11/05/pep-boys/
<http://campaign.r20.constantcontact.com/render?llr=tmrqv5fab&v=001EgdY2fhRL-UipBb6Zq-
L_j9LXGjHfHXBTEVmYo2JZEhiVb1NDmiejtvmhKcInBq-
PUh_dNUyRUftjSeia1bH3Y3XHG1sJC5xhorDKXiCnBtG2mqqAIm26tz_
7YzMiK_GzBzUA5udzpchxJ_X60WPDC9Z5f6iOM1E>


[http://ih.constantcontact.com/fs004/1105909532051/img/72.jpg]


Pep Boys Site Submission Requirements


[http://ih.constantcontact.com/fs184/1105909532051/img/325.jpg]

    *    Pep Boys Seeking Locations for both Super centers & Service and Tire Centers
    *    Publicly Traded Company on NYSE: "PBY"
    *    Over 740 owned and leased locations
    *    Currently in 35 States and Puerto Rico
    *    All Company Run Stores with Corporate Signature
    *    Currently operating over 7,000 services bays
"Schedule an appointment today at the New York ICSC Show.  Winick Realty Group Booth #157

Rhinelander Gallery at The Hilton"

FOR FURTHER INFORMATION PLEASE CONTACT EXCLUSIVE BROKER:

Tyler Bennett
201-441-3511
tyler@winick.com<mailto:tyler@winick.com>

Pepboys Supercenter Site Submission Flyer<http://r20.rs6.net/tn.jsp?e=
001ADkdbHXF6PEuFdPurlWijThgAOl3AL2cIeRNuXc3Fx_
9iqUwMeNskthvcx1o5BJpOswt7VjNUCTgY5vLvSDKQKeYsCa9WMjdJ9CtBQLGL77WRcnqfnNOUsgykHQgawymF-
MtMVI6xVvHzZK5nqRARInVGWPezW0BybwrqaRvpAPZPsmvWrs6S-XCODJa5mhR>

Pepboys Service and Tire Center Site Submission Flyer<http://r20.rs6.net/tn.jsp?e=
001ADkdbHXF6PEWx6A5-3wC4DkxcuJky9fuezuDb1IrwiSLRrbZsVK3wZu9poPTyNK_
8sYPse8DKoTu7CiAJSxqEgqLsIyyN7c1QGUFWeWQVnkilNsVZmRSMW6JQZgLMXz33v1_wWjgvjIR6txpDYvKtCB0aB
Iz-MopCJgYj9sdIrcg59Qqf9oS_4cTHRy1EYzN>

http://winick.us/2012/11/05/pep-boys/

[http://ih.constantcontact.com/fs184/1105909532051/img/322.jpg]


[http://ih.constantcontact.com/fs184/1105909532051/img/324.jpg]


THE LATEST LISTINGS FROM WINICK REALTY  more properties<http://r20.rs6.net/tn.jsp?e=
001ADkdbHXF6PGmAxKMyIrnCW6tDFnqCRUPBo-CWW3_k5BZg3mJzi-
TKu1gWuX6zB_y0rQYdSA8J1qy4bH6xYCeAuMTW2leQ55br_nadWF7upBSENpP4MAac7X6hsw4q1qb>
THE LATEST HEADLINES FROM WINICK DAILY more headlines<http://r20.rs6.net/tn.jsp?e=
001ADkdbHXF6PH_w4ENvJfxGn5fK-
CSvFgLnWni4ayQIzUejc2RRBORJe3soutbvZUaeVjytOD7vhcQJDQ_zfAanTkigWaFO9fZtvWCurVF_XHHU3wmZEyd
Vw==>


[http://img.constantcontact.com/letters/images/1101093164665/jmml_opgr1
_img1.gif]<http://visitor.r20.constantcontact.com/email.jsp?m=1105909532051>




Forward email<http://ui.constantcontact.com/sa/fwtf.jsp?llr=tmrqv5fab&m=1105909532051
&ea=jmiller%40rasbrokerage.com&a=1111506814804>
[http://img.constantcontact.com/letters/images/SafeUnsubscribe_Footer_Logo_New.png]<http:/
/visitor.constantcontact.com/do?p=un&mse=001xTbFH0kX3uF6jljyC7ozULV_2aW2dh9vEYft2SkhoQs%
3D&t=001laKxOYaOUW4o8-SD3WA3SA%3D%3D(=001FCSs65SMrsI%3D&llr=tmrqv5fab>


This email was sent to jmiller@rasbrokerage.com<mailto:jmiller@rasbrokerage.com> by
tbennett@winickmail.com<mailto:tbennett@winickmail.com> | Update Profile/Email
Address<http://visitor.constantcontact.com/do?p=oo&mse=001xTbFH0kX3uF6jljyC7ozULV_
2aW2dh9vEYft2SkhoQs%3D&t=001laKxOYaOUW4o8-SD3WA3SA%3D%3D(=001FCSs65SMrsI%3D&llr=tmrqv5fab>
| Instant removal with SafeUnsubscribe<http://visitor.constantcontact.com/do?p=un&mse=
001xTbFH0kX3uF6jljyC7ozULV_2aW2dh9vEYft2SkhoQs%3D&t=001laKxOYaOUW4o8-SD3WA3SA%3D%3D(=
001FCSs65SMrsI%3D&llr=tmrqv5fab>™ | Privacy
Policy<http://ui.constantcontact.com/roving/CCPrivacyPolicy.jsp>.

Winick Realty Group, LLC | 212-792-2600 | 655 Third Avenue | 8th Floor | New York | NY |
10017

This email has been scanned by the inbound MessageLabs Email Security System.
For more information please visit http://www.symanteccloud.com